IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ANIRE OKPAKU,                                    )
                                                 )
                                                 )
            Plaintiff,                           )
                                                 )
                                                 )
v.                                               )
                                                 )        No. 06-61392-CIV-COHN
                                                 )
AMERICAN AIRLINES, INC.,                         )
                                                 )
                                                 )
            Defendant.                           )
                                                 )
                                                 )
                                                 )
                                                 )

PRELIMINARY EXPERT REPORT AND DISCLOSURE OF
PETER GAMPEL, CPA, ABV, ASA

SUBMITTED OCTOBER 10, 2007



## TABLE OF CONTENTS

I.      **INTRODUCTION** ……………………………………………………**3**

     A.  Assignment ………………………………………………3

     B.  The Parties and the Dispute ………………………………… 4

     C.  Summary of Raffa's Opinions ……………………………………5

     D.  Key Assumptions Contained in the Raffa Preliminary Report …………5


II.      **MY OPINIONS** …………………………………………………**7**

     A.  Number of Projected "Four-Hour Minimum" Procedures Flawed ………7

     B.  Raffa Did Not Include Mitigation as an Offset …………………………10

     C.  Raffa Failed to Consider Okpaku's Compensation Structure …………13

     D.  Raffa's Annual Earnings Growth Rate Excessive ………………………14

     E.  Raffa's Discount Rate Not Properly Determined ………………………15


III.     **CONCLUSION** ………………………………………………**16**


IV.     **OTHER MATTERS** ……………………………………………**17**


**APPENDICES**

    A       Curriculum Vitae and Expert Witness History

    B       Documentation and Information Provided by Counsel


**SCHEDULES**

    1       Summary Chart of Actual Number of Procedures by Anire Okpaku and Estimated Number of Procedures per Strax Surgeon (Excluding and Including Okpaku) For the 14-month period from July 18, 2006 through September 21, 2007

    2       Summary of Strax Payments to Okpaku For weeks ended 7/14/2006 through 8/25/2007

2

## I.    INTRODUCTION

### A. Assignment

I, Peter Gampel, am an Executive in the public accounting firm of Crowe Chizek and Company LLC ("Crowe Chizek"). I have been retained in this matter by Gregory M. Palmer, Esq., of Rumberger, Kirk and Caldwell, P.A., Counsel for Defendant American Airlines, Inc. ("American Airlines") to render my professional opinion in connection with the dispute between Plaintiff Anire Okpaku ("Okpaku") and Defendant American Airlines. Specifically, I was asked to provide analysis and expert opinion as it relates to the preliminary expert report by Frederick A. Raffa ("Raffa"), of Raffa Consulting Economists, Inc., dated September 24, 2007 setting forth his opinion as to Okpaku's loss of past and future earnings capacity related to this case ("Raffa Preliminary Report"). This report describes the scope of the assignment, my opinions, the basis of my opinions, and the documentation and information considered.

My opinions and conclusions are based upon the documentation and information provided to me through the date of this report. The Raffa Preliminary Report along with other production were received by me on October 3, 2007. I have prepared this analysis in the event that American Airlines is liable for any damages as a result of the allegations of Okpaku. I reserve the right to modify and update this report and the opinions and conclusions expressed herein to the extent that relevant additional documentation and/or information is received and/or reviewed subsequent to the date of this report. I expect to testify to the opinions and other matters set forth in this report.

Appendix A contains my curriculum vitae, which sets forth my qualifications to perform this analysis and provide expert opinions, and includes my expert testimony during at least the last four years. The analysis discussed herein is based upon an accounting perspective and my experience in the area of litigation support. In addition to my professional qualifications, my opinions are based on my understanding and my interpretation of the documentation, records and other information provided to me and reviewed as of the date of this report listed in Appendix B.

## B.  The Parties and Dispute

The following discussion is based on my reading of the Raffa Preliminary Report, Plaintiff's Complaint ("Complaint") and other information, and is included solely for background purposes.  It does not purport to represent a comprehensive recitation of all pertinent facts or allegations in the case, nor an admission by the Defendant of the veracity of those allegations.

### Plaintiff

The Plaintiff, Okpaku, allegedly sustained injury when the seatback of the airplane seat in which he was seated failed causing him to fall backward to the floor.  This occurred on September 26, 2004 (the "Accident Date") on American Airlines flight #1116 from Portland, Oregon en route to San Antonio, Texas.  Okpaku was a medical resident as of the Accident Date.

During the period from July 18, 2006 through a current date, it is my understanding that Okpaku's only source of income emanated from Strax Rejuvenation and Aesthetics Institute ("Strax"), an entity into which Okpaku entered into a contractual relationship.   The Independent Contractor Agreement between Strax and Okpaku dated July 12, 2006 established Okpaku's compensation based on the following:

    a)  Guaranteed weekly base salary of $5,000;

    b)  Performance bonus, paid weekly, based upon the greater of $5,000 or 18% of revenue generated by procedures worked on by Okpaku.

### Defendant

The Defendant, American Airlines, is a Texas corporation that is a common carrier of passengers by air.

4

### C.  Summary of Raffa's Opinions

In his Preliminary Report, Raffa stated that he expected to provide an opinion of: 1) the loss of past and future earnings capacity of Okpaku, and 2) the present value of any future medical care that may be required by the Plaintiff.  However, the opinions expressed in his report related only to the point #1 above, the loss of past and future earnings capacity.

Raffa opined that Okpaku had sustained damages in the amount of $8,320,320 as measured by the present value of his alleged loss of future earnings and that $432,757 was Okpaku's past and present earnings loss.  The sum of these amounts is $8,753,077.

Raffa's opinion of the amount of Okpaku's lost income was based on the assumption that Okpaku was unable to undertake the same volume of "Four-Hour Minimum" procedures that he would have but for his injuries. .  The "Four Hour Minimum" procedures were identified by Okpaku and Strax management as surgeries requiring at least four hours to perform.

### D.  Key Assumptions Contained in the Raffa Preliminary Report

Raffa determined the aggregate amount of lost income by calculating the difference between the projected and actual "Four-Hour Minimum" procedures performed by Okpaku during the period from July 18, 2006 through September 21, 2007. .  Raffa then extrapolated the results from this period for both the past and future loss of income sustained by Okpaku.   Raffa's assumptions in performing this analysis were as follows:

|    |                                                                                          | From July 18, 2006 To Sept. 21, 2007 |
| -- | ---------------------------------------------------------------------------------------- | ------------------------------------ |
| a. | Actual number of procedures by Okpaku                                                     | 771                                  |
| b. | Projected number of "Four-Hour Minimum" procedures that Okpaku could have performed (25% of 771 in a. above) | 193                 |
| c. | Actual number of "Four-Hour Minimum" procedures by Okpaku                                 | 25                                   |
| d. | Difference between projected and actual  (b – c above)                                    | 168                                  |
| e. | Average revenue per "Four-Hour Minimum" procedure                                         | $12,000                              |
| f. | Okpaku's assumed incremental earnings of 18% of $12,000                                   | $2,160                               |

|  | Okpaku's Loss |
|---|---|
| **Continuation of Key Assumptions in the Raffa Preliminary Report** | <u>Per Raffa</u> |

g. Loss through September 21, 2007 (d. 168 procedures x  f. $2,160)     $362,880

h. Okpaku had the capacity to perform up to 20 additional "Four-Hour Minimum" procedures over-and-above those that he already performed

i. No additional operating expenses and no additional variable expenses in generating additional income from the "Four-Hour Minimum" procedures would be incurred

j. Use of 14-month historical period (July 18, 2006 to September 21, 2007)

k. Average monthly loss of $25,920 based on historical calculations (g. $362,880 divided by j. 14 months);

yearly projected loss of $311,043 ($25,920 times 12 months)

l. Loss from September 21, 2007 to December 2007 (date of trial)     <u>$69,877</u>

Total loss to trial (g. $362,850 + l. $68,877 above)     $432,757

m. An assumed post-trial life expectancy 26.75 years to age 66

n. An assumed earnings growth rate of 4.37% based on 1990-2008 U.S. Department of Labor data for the offices of physicians

o. A discount rate of 4.37% based on the assumption that the earnings growth rate (n. above) is equal to the interest rate for discounting the future earnings to present value

p. Loss of future earnings capacity     <u>$8,320,320</u>

q. Total loss of income to Okpaku per the Raffa Preliminary Report (l. + p.)     <u>$8,753,077</u>

## II.      MY OPINIONS

Based on my analysis of the Raffa Preliminary Report, in my opinion there are numerous flaws in Raffa's analysis of Okpaku's lost earnings These flaws included unsubstantiated assumptions and methodological deficiencies which, when taken in the aggregate, lead to an erroneous and unreliable opinion of Okpaku's loss of earnings , if any.

## A.      Number of Projected "Four-Hour Minimum" Procedures Flawed

Raffa relied upon Okpaku's 771 actual number of procedures during a 14-month period from July 18, 2006 through September 21, 2007 (13 full-months + 2 half-months) as the basis on which to determine the projected "Four-Hour Minimum" procedures that Okpaku could have completed during that period.  That quantum was multiplied by a 25% factor to arrive at 193 projected "Four-Hour Minimum" procedures that Okpaku could have completed during that period.  Raffa indicated that the 25% factor was the percentage of "Four-Hour Minimum" procedures that the average plastic surgeon of Strax performs.

## a)      Raffa's Selection of the Number of Procedures Performed Skewed to the High Side

Okpaku actually completed 25 "Four-Hour Minimum" procedures during this 14-month period.  Based on a total of 771 total procedures for the 14-month period, Okpaku would have performed 746 procedures (771 total less 25 "Four-Hour Minimum") of shorter duration ("Shorter Period") procedures.   Therefore, Okpaku's mix of procedures was 97% "Shorter Period" (746 divided by 771) and 3% "Four-Hour Minimum" (25 divided by 771).

While Okpaku may have done fewer "Four-Hour Minimum" procedures, it is apparent that he performed a much higher number of "Shorter Period" procedures when compared to other surgeons as will be further discussed.  Accordingly, Raffa's arbitrary selection of the number of actual "Four-Hour Minimum" procedures is skewed to the high side because Okpaku had undertaken a greater number of "Short Period" procedures in lieu of the "Four-Hour Minimum" procedures.

I have not been provided with the actual total number of procedures undertaken by all of Strax's surgeons to determine the average number of procedures per surgeon. In addition, Raffa did not address the type and number of procedures performed by other Strax surgeons, as well as their financial compensation structure, that would have provided further insight.

In the absence of having that information, Jeffrey Davis ("Davis"), CEO of Strax, testified that the estimated average total number of procedures performed by physicians in Strax on a weekly basis was 75.[1] Davis also testified that 8 surgeons (including Okpaku) perform plastic surgery procedures at Strax.[2]

Based on this information, and assuming that the 14-month period used by Raffa was comprised of 58 working weeks,[3] the total number of procedures by all of Strax's surgeons would be 4,350 procedures (58 weeks times 75 procedures). By subtracting the 771 actual procedures of Okpaku, I estimated that the total number of procedures performed by the 7 other surgeons was 3,579 total procedures or 511 procedures per surgeon. Okpaku performed 771 procedures, which is approximately 50% more than the average of the other Strax surgeons. This substantiates that Okpaku performed more "Shorter Period" procedures in lieu of "Four-Hour Minimum" procedures. Schedule 1 sets forth a comparison of procedures undertaken by Okpaku and other Strax surgeons.

If I were to include Raffa's additional 168 "Four-Hour Minimum" procedures that Okpaku could have performed over-and-above his actual 771 procedures, Okpaku would have undertaken a total of 939 procedures for the 14-month period. This is an unrealistic level of procedures which is well in excess of the practice average as noted above.

---

[1] Deposition of Jeffrey Davis on July 27, 2007, at page 38.
[2] Ibid, at page 22.
[3] Period from July 18, 2006 through September 21, 2007 is approximately 61 weeks less 3 weeks for paid time off

**b)      Raffa's Percentage Factor Unsubstantiated and Applied to Overstated Starting Point**

As explained above, Raffa applied a 25% factor to determine the number of "Four-Hour Minimum" procedures projected for Okpaku.  Raffa provided no substantiation for the 25% figure.  However, Davis testified that he estimated the number of "Four-Hour Minimum" procedures to be 20% of all procedures undertaken.[4]

I estimated the projected number of "Four-Hour Minimum" procedures by all Strax surgeons by multiplying 4,350 procedures times the 20% percentage obtained from Davis.  This resulted in 870 "Four-Hour Minimum" procedures by all 8 surgeons or an average of 109 per surgeon for the 14-month period.  On this basis, Raffa's projected "Four-Hour Minimum" procedures for Okpaku of 193 appears high and is overstated by over 77%.  See Schedule 1.

This calculation was strictly to demonstrate that Raffa's projected number of "Four-Hour Minimum" procedures was overstated, which in turn significantly overstates Okpaku's estimated economic loss of earnings.

Davis stated in his testimony that he estimated the number of multiple procedures (i.e. "Four-Hour Minimum" procedures) deferred by Okpaku was "somewhere between 33 and 50 percent."[5]  Based on Davis' estimate and taking into account the number of actual "Four-Hour Minimum" procedures by Okpaku of 25, the total number of procedures that Okpaku could have performed would range from 37 to 50 procedures in the 14-month period, as opposed to the actual 25 undertaken by him.  This alternate calculation results in an even lower number of projected "Four-Hour Minimum procedures" for Okpaku than my prior estimate of 109 procedures.

---

[4] Deposition of Jeffrey Davis on July 27, 2007, at page 38.
[5] Ibid, at page 42.

c)      **Raffa's Flawed Extrapolation of "Four-Hour Minimum" Procedures**

An additional flaw in Raffa's lost earnings analysis is Raffa's extrapolation of the difference of projected to actual "Four-Hour Minimum" procedures that Okpaku would have completed throughout the period of his analysis. Raffa's analysis extends to age 66 for Okpaku, a period of 26.75 years. In making this calculation, Raffa assumed that Okpaku would be capable of undertaking the same number of "Four-Hour Minimum" procedures over the next 26.75 years until retirement at age 66 and that he would be working as a physician until full retirement age without an alternative career choice in his later years.

This assumption is contradicted by Davis' testimony. As Davis indicated, "some of them *[surgeons]* are older and they say 'I don't want to do the multiple procedures *["Four-Hour Minimum" procedures]*, because I can't stand for five and a half hours."[6] Therefore, it would appear highly unlikely that Okpaku would maintain the same number of "Four-Hour Minimum" procedures later in his career as he could possibly do earlier in his career. As a consequence, Raffa has overstated the number of "Four-Hour Minimum" procedures that Okpaku could have performed through September 2007. Furthermore, Raffa overstated the number of procedures that Okpaku could perform in future periods by not taking into account a reduction of "Four-Hour Minimum" procedures over the career length of Okpaku.

**B.      Raffa Did Not Include Mitigation as an Offset**

The prior section simply sets forth a discussion and analysis as to the overstatement of the "Four-Hour Minimum" procedures used by Raffa in his analysis. The analysis that I determined therein does not purport to represent or suggest that even the minimum number of "Four-Hour Minimum" procedures forms a proper and correct analysis. In my opinion, Raffa's approach is premised on the following erroneous assumptions.

Raffa's analysis of the projected loss of Okpaku to undertake "Four-Hour Minimum" procedures was based on a total loss of incremental revenue and related earnings to Okpaku. Raffa assumed that this loss was over-and-above the actual level of earnings of Okpaku. Raffa

---

[6] Ibid, at page 41, *[italics text in brackets added for clarification]*.

also assumed that there were no additional variable costs or expenses in generating this additional revenue and earnings.

Raffa's incremental revenue assumption is flawed for several reasons. First of all, it does not take into account any mitigation with respect to these additional incremental earnings. Davis testified about Okpaku's schedule at Strax that "it [Okpaku's schedule] varies, based on the daily surgeries. It varies from day-to-day. He might start at six-thirty in the morning, he might start at nine o'clock. He may be out of here at five; he might be out of here at seven."[7] And when asked how many days a week Okpaku works, Davis testified that more often than not, six days a week.[8] Okpaku testified that he works between 60 and 70 hours per week and that he works everyday.[9] Okpaku also testified that there was never an instance where he was unable to perform a scheduled surgery.[10] Okpaku responded "no" when asked if his back and neck pain limited the number of surgeries performed at Strax.[11] Okpaku also testified that he is capable of doing everything [all types of surgeries].[12]

This suggests that Okpaku worked full-time. To the extent that he did not perform "Four-Hour Minimum" procedures, as discussed above, he substituted these procedures with other surgical procedures. That is, he didn't work fewer hours but rather was offered or chose to devote himself to alternative procedures to fill his daily schedule for his six working days per week at Strax.

Raffa's calculation based on the incremental revenue and earnings from the "Four-Hour Minimum" procedures was premised on receipt of $12,000 per procedure. I was provided with two-page list of surgical procedures with hand-written prices for some "Four-Hour Minimum" procedures. However, I could not corroborate any of these price ranges with a formal pricelist or Strax invoice records. As explained above, Okpaku substituted other "Shorter Period" procedures for the "Four-Hour Minimum" procedures. With the information I have been provided, it is difficult to determine whether or not four "Shorter Period" procedures of, for

---

[7] Ibid, at page 21 [italics text in brackets added for clarification].
[8] Ibid, at page 22.
[9] Deposition of Anire Okpaku, March 9, 2007, at page 11 and 50.
[10] Ibid, at page 52 and 53.
[11] Ibid, at page 54.
[12] Ibid, at page 63.

11

example, one-hour duration each would result in more or less revenue than one "Four-Hour Minimum" procedure. Nevertheless, although I have not been provided with a pricelist, Davis testified that an individual "Shorter Period" procedure such as breast augmentation can be priced between approximately $4,000 to $5,000.[13]

Since Okpaku's six day a week work schedule entailed full days of activity, it would appear that he substituted procedures to compensate for the loss of the "Four-Hour Minimum" procedures. That is why the number of procedures that Raffa used as a benchmark in determining a relative amount of "Four-Hour Minimum" procedures was incorrect since it includes many "Shorter Period" procedures that result in an arbitrarily higher number of procedures for purposes of his calculation.

Furthermore, Davis testified that "We [Strax] only have so many places to do surgeries."[14]  This would suggest a capacity constraint.  Yet, Okpaku was still able to work complete days on a full-time basis.

In addition, Okpaku was paid by Strax on the basis of base salary with a performance bonus portion.  It would be in Okpaku's best interest, as a prudent professional, to maximize his level of earnings whenever possible.  The substitution of "Shorter Period" procedures that produced significant revenue and earnings to him would allow him to accomplish that goal.

In my opinion, Raffa failed to include a determination of mitigation which resulted in double-counting of revenues and earnings to Okpaku.  This was a result of Raffa not recognizing the earnings related to the "Shorter Period" procedures that Okpaku performed in lieu of "Four-Hour Minimum" procedures.  The earnings from the substituted "Shorter Period" procedures should be subtracted from Raffa's loss of earnings calculation to Okpaku.

---

[13] Deposition of Jeffrey Davis on July 27, 2007, at page 35.
[14] Ibid, at page 22 [italics text in brackets added for clarification].

### C.    Raffa Failed to Consider Okpaku's Compensation Structure

As noted earlier herein, the financial arrangement between Strax and Okpaku provided for a performance bonus based on an 18% of revenues generated by Okpaku ("18% performance bonus") only to the extent that such formula exceeded a $5,000 weekly threshold.  In other words, Okpaku would have to perform procedures generating weekly revenue for Strax greater than $27,778 ($5,000 divided by 18%) to be eligible for the 18% performance bonus.

Schedule 2 sets forth a summary of Strax payments to Okpaku.  Based on this schedule, the payment amounts indicate that Okpaku was not eligible for the 18% performance bonus in many weeks.  In fact, Okpaku appears to have not received the 18% performance bonus in approximately 10 weeks out of the total 59 weeks in the period from July 2006 through August 2007.

To the extent that the weekly revenue generated by Okpaku would not provide him with the 18% performance bonus, the calculations prepared by Raffa are erroneous.  Furthermore, Raffa made no analysis of the additional revenue and associated bonus compensation, if any, that Okpaku would receive by changing the mix of procedures to include more "Four-Hour Minimum" procedures and fewer "Shorter Period" procedures.  Without such analysis, Raffa's calculations are speculative and unsupported.  To the extent that the revenue threshold to trigger the 18% performance bonus is not met through either the "Shorter Period" procedures or the "Four-Hour Minimum" procedures, Okpaku would not be entitled to the 18% performance bonus for those particular weeks.

Therefore, a significant amount of Raffa's estimated incremental revenue and earnings would be excluded from Raffa's opinion of loss since he assumed that all weeks would provide Okpaku with the 18% performance bonus.

Accordingly, Raffa's analysis is flawed as it did not appropriately consider Okpaku's compensation scheme and the fact that the 18% performance bonus is not automatic and requires an analysis of the impact in revenues, if any, of Okpaku hypothetically performing more "Four-Hour Minimum" procedures and fewer "Shorter Period" procedures.

**D.      Raffa's Annual Earnings Growth Rate Excessive**

Raffa used the U.S. Department of Labor data for the offices of physicians for the period 1990 – 2008 to arrive at his 4.37% growth rate.

I have not been provided with several years of Strax annual rate schedules regarding costs of procedures that would provide an indication of escalating prices or price reductions for plastic surgery procedures.  Based upon testimony of Davis, procedures were readily discounted based upon the customer and competitive deal.  His comment suggests that the market for plastic surgery is very competitive and subject to pricing pressures.

Since there is a contractual relationship between Strax and Okpaku, the nature of that Independent Contractor Agreement should be examined when determining the growth rate. Okpaku's base salary is fixed and does not include an escalation clause.

Based upon the review and analysis of the compensation earned by Okpaku during the 59-week period ended August 25, 2007 of $481,432 (Schedule 2) or on a 52-week relative year basis of $424,313, approximately 60% of his compensation from Strax was fixed (52 weeks times $5,000 per week) with the remaining 40% representing the performance bonus.

As such, one cannot assume that all of Okpaku's compensation would be subject to the growth rate adjustment of 4.37% as suggested by Raffa.  Assuming that only 40% of the growth rate would be based on Raffa's 4.37%, and the remaining 60% would be impacted with a Consumer Price Index ("CPI") factor of 2.5%[15] for the "fixed portion" of Okpaku's compensation, the blended average growth rate would therefore be 3.25%.[16]

Accordingly, Raffa's growth rate selection based upon general national data for physicians is unreliable because it lacks consideration of other relevant factors such as pricing data for plastic

---

[15] U.S. Department of Labor, Consumer Price Index ("CPI") 1982 – 84 = 100, 1st half of 2007 v. 2006.
[16] The application of the CPI factor assumes escalation in the amount of base compensation even though the agreement between Okpaku and Strax does not call for it.  Had I excluded the CPI pursuant to an actual interpretation of the agreement, the growth rate would be reduced to 1.75%.

surgery, industry trends and local market conditions, and most importantly, the contractual arrangement between Okpaku and Strax.

## E.      Raffa's Discount Rate Not Properly Determined

Raffa chose a discount rate to match that of his growth rate at 4.37%. No independent analysis was undertaken to gauge various yields in the marketplace to make an actual determination of the discount rate. It appears that he selected the same discount rate based on his selected growth rate as a matter of convenience.

As of September 28, 2007, the 30-year Treasury rate was 4.83%.[17] This is a long-term risk free rate that assumes no disruption to Okpaku's earnings. However, there is uncertainty associated with whether or not Okpaku would work for an additional 26.75 years as assumed by Raffa. Retirement may not necessarily equate to work-life of a physician. Okpaku may choose not to work until full-retirement age of 66. He may choose to work part-time in his latter years or not at all. He may also choose to pursue other types of business opportunities well prior to age 66. Therefore, a risk premium of 2% should be added to the 4.83% risk-free to account for the uncertainty of Okpaku working full-time until age 66. Accordingly, the discount rate would be 6.83%.

The impact of Raffa assuming that the discount rate was equal to the growth rate effectively eliminates his present value determination and overstates Raffa's conclusions. On the contrary, I am of the opinion that the potential growth rate in this instance of 3.25% (or 1.75% assuming no escalation of base salary) is lower than the discount rate of 6.83%, and therefore, the loss of future earnings, if any, should take these factors into account.

---

[17] Federal Reserve Statistical Release, H-15 Selected Interest Rates.

## III.   CONCLUSION

In my opinion there are numerous flaws in Raffa's analysis of Okpaku's lost earnings. These flaws included unsubstantiated assumptions and methodological deficiencies which, when taken in the aggregate, lead to an erroneous and unreliable opinion of Okpaku's loss of earnings.

Accordingly, I am of the opinion based upon the documentation and information made available to me by the date of this report that any loss of earnings attributable to Okpaku as a result of his alleged injury would range from zero to a far more limited or nominal amount pursuant to my analysis included in this report.

The loss of earnings would be zero to the extent that the revenue derived from the "Shorter Period" procedures fully offsets the comparable revenue from the "Four-Hour Minimum" procedures. I have not been provided with any documentation or information that refutes this.

To the extent that the "Four-Hour Minimum" procedures revenue would be in excess of the revenue derived from the "Shorter Period" procedures, a loss of earnings may result but only if the revenue threshold triggering the 18% performance bonus is met. Based upon the analysis hereinabove, and the documentation and information made available to me to date, the number of additional "Four-Hour Minimum" procedures are far fewer than those presented by Raffa.

Consequently, the potential loss of earnings to Okpaku would range from zero to a far more limited or nominal amount pursuant to my analysis included in this report.

## IV.    OTHER MATTERS

If called to testify in this matter, I may present demonstrative exhibits at trial which graphically illustrate my opinions.   Such exhibits, if any, will be made available as directed by Counsel.  I reserve the right to modify and update this report and the opinions and conclusions expressed herein to the extent that relevant additional documentation and/or information is received and/or reviewed subsequent to the date of this report.   Appendix B is a listing of documents considered.

Crowe Chizek is compensated for my time at the hourly rate of $325 plus reimbursement of any out-of-pocket expenses.

Our fees are not contingent for any reason.

Respectfully submitted by:  _Peter Gampel_

Peter Gampel

Date: October 10, 2007

**APPENDIX A**

**STATEMENT OF QUALIFICATIONS AND CURRICULUM VITAE
EXPERT TESTIMONY HISTORY**

**(SEE ATTACHED)**

Re:    ANIRE OKPAKU v. AMERICAN AIRLINES, INC.

       PRELIMINARY EXPERT REPORT AND DISCLOSURE OF
       PETER GAMPEL, CPA, ABV, ASA
       SUBMITTED OCTOBER 10, 2007

# STATEMENT OF QUALIFICATIONS

## PETER GAMPEL, CPA (MO), ABV, ASA, CBV, CA

**EDUCATION**

McGill University, Bachelor of Commerce, Accounting and Finance, 1977

McGill University, Diploma in Public Accountancy, Post-Graduate Studies, 1980

**PROFESSIONAL DESIGNATIONS**

American Institute of Certified Public Accountants, Accredited in Business Valuation (ABV), 2003

Certified Public Accountant (CPA), Missouri, 1995

American Society of Appraisers, Accredited Senior Appraiser (ASA), Business Valuation, 1986

Canadian Institute of Chartered Business Valuators, Chartered Business Valuator (CBV), 1984

Order of Chartered Accountants of Quebec, Chartered Accountant (CA), 1982

Member, American Institute of Certified Public Accountants

Member, Florida Institute of Certified Public Accountants

**EMPLOYMENT**

Crowe Chizek and Company LLC, *formerly Madsen Sapp Mena Rodriguez & Co.* Fort Lauderdale, FL

Executive, Valuation and Litigation Support Services, April 2002 to present

Arthur Andersen LLP, Miami, FL

Principal and Director of Florida and Caribbean Valuation Services Group, December 1995 – March 2002

Rachlin, Cohen & Holtz, CPA's, Miami, FL

Consultant in Litigation and Valuation Services, September 1993 to December 1995

Richard Wise & Partners, Consultants, Montreal

Consultant in Litigation and Valuation Services, July 1992 to August 1993

Goldstein, Lewin & Co., CPA's, Boca Raton, FL

Director of Litigation and Valuation Consulting Practice, October 1990 to June 1992

Richter, Usher & Vineberg, Chartered Accountants, Montreal

Director of Litigation and Valuation Consulting Practice, 1986 to September 1990

Prior history included other valuation/merger and acquisition experience from 1982 to 1990 as well as audit experience with international accounting firms from 1977 to 1981.



# STATEMENT OF QUALIFICATIONS

## PETER GAMPEL, CPA (MO), ABV, ASA, CBV, CA

**EXPERIENCE**    Exclusively involved in litigation consulting and business valuation since 1981;

Preparation of more than 1,000 valuation reports for purposes of:

| *VALUATION* | *LITIGATION* |
|---|---|
| Purchases and sales | Economic damages |
| Management buy-ins and buy-outs | Loss of profits |
| Minority interest shareholdings | Breach of contract |
| Limited partnership interests | Product liability |
| Estate and gift tax | Patent infringement |
| Corporate tax planning | Intellectual property |
| Purchase price allocation (SFAS 141) | Personal injury |
| Intangible assets and useful life | Shareholder / partnership disputes |
| Goodwill and intangible asset | Marital disputes |
| impairment (SFAS 142, 144) | Disputes with taxation authorities |

**COURT
TESTIMONY**    Circuit Courts:
- 11th Judicial Circuit, Dade County, Florida
- 15th Judicial Circuit, Palm Beach County, Florida
- 17th Judicial Circuit, Broward County, Florida
- 20th Judicial Circuit, Collier County, Florida

United States Tax Court
United States Bankruptcy Court
American Arbitration Association
Quebec Superior Court

**ARTICLES**    South Florida Business Journal
Medical Business – South Florida Edition
The Florida Bar Quarterly Report
Business Valuation Review
CA Magazine
The Montreal Gazette Newspaper
Lawyers Weekly
The National



# STATEMENT OF QUALIFICATIONS

### PETER GAMPEL, CPA (MO), ABV, ASA, CBV, CA

| | |
|---|---|
| **PRESENTATIONS** | Florida Venture Capital Forum |
| | Estate Planning Council of Broward County |
| | Fort Lauderdale Tax Council |
| | Estate Planning Council of Martin County |
| | Medical Business Seminar |
| | Lectured on the subject of business valuation at Concordia University, Montreal in both the MBA and Post Graduate Commerce Programs |
| **LANGUAGES** | English and French |
| **PERSONAL** | Born 1953 in Montreal, Canada |
| | Married, two daughters |



**Peter Gampel**
**Summary of Expert Witness Activities**
**Recent History Updated as of October 10, 2007**

Page 1

| Year | Case Name | Case Number | Jurisdiction | Attorneys |
|------|-----------|-------------|--------------|-----------|
| 2007 | Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.<br>- Deposition testimony<br>- Assistance to attorney representing Defendant | 06-20624-CIV-GOLD | United States District Court for the Southern District | **For Petitioner:**<br>Alexander Anguiera, Esq.<br>Samuel O. Patmore, Esq.<br>Stearns Weaver Miller Weissler Alhadeff & Sitterson<br><br>**For Defendant:**<br>Gregory M. Palmer, Esq.<br>Michael R. Holt, Esq.<br>Rumberger, Kirk & Caldwell |
| 2006 | Plaza Properties Group, Inc., et al vs. Grinnell Corporation, Inc.<br>- Deposition testimony<br>- Assistance to attorney representing Defendant | 02-010234 CACE 13 | Circuit Court of the 17th Judicial Circuit, Broward County | **For Petitioner:**<br>William S. Spencer, Esq.<br>Michael W. Marcil, Esq.<br>Gunster, Yoakley & Stewart<br><br>**For Defendant:**<br>David C. Willis, Esq.<br>Daniel J. Gerber, Esq.<br>Eric L. McAliley, Esq.<br>Rumberger, Kirk & Caldwell |
| 2006 | Marc E. Bosem, M.D., et al vs. Musa Holdings, Inc. et al<br>- Deposition and trial testimony<br>- Assistance to attorney representing Defendants | 00-012018 CACE 08 | Circuit Court of the 17th Judicial Circuit, Broward County | **For Petitioner:**<br>Jeffrey A. Norkin, Esq.<br>Jeffrey A. Norkin, P.A.<br><br>**For Defendants:**<br>Paul O. Lopez, Esq.<br>Tripp Scott |
| 2006 | Joy L. Rodak vs. Mobile Medical Industries, Inc.<br>- Deposition and arbitration panel testimony<br>- Assistance to attorney representing Respondent | AAA No: 321660072804 | American Arbitration Association | **For Claimant:**<br>Eddy O. Marban, Esq.<br>The Law Offices of Eddy O. Marban<br><br>**For Respondent:**<br>Christine L. Wilson, Esq.<br>Jackson Lewis LLP |

**Peter Gampel**
**Summary of Expert Witness Activities**
**Recent History Updated as of October 10, 2007**                              **Page 2**

| Year | Case Name | Case Number | Jurisdiction | Attorneys |
|------|-----------|-------------|--------------|-----------|
| 2005 | Edward Lipton vs. Intercept Payment Solutions, Inc. and Raymond Moyer<br>- Deposition testimony only<br>- Assistance to attorneys representing Defendants | 03-62040-CIV (MARRA/SELTZER) | United States District Court for the Southern District | **For Petitioner**:<br>Andrew T. Lavin, Esq.<br>Navon & Lavin, P.A.<br><br>**For Defendants**:<br>Anthony Carriuolo, Esq.<br>Berger Singerman P.A.<br><br>Bridget A. Berry, Esq.<br>Greenberg Traurig, P.A. |
| 2004 | King of Fans, Inc. vs. Litex Industries Limited<br>- Deposition testimony only<br>- Assistance to attorney representing Petitioner | 03-61637 CIV (COOKE) | United States District Court for the Southern District | **For Petitioner**:<br>Stefan Stein, Esq.<br>Holland & Knight LLP<br><br>**For Defendants**:<br>Thomas Watkins, Esq.<br>Brown Mc Carrol, LLP<br><br>Joseph Bain, Esq.<br>Jennifer Cohn Glasser, Esq.<br>Akerman Senterfitt |
| 2003 | Estate Irving Gurberg vs. The Deputy Minister of Revenue of Quebec<br>- Trial testimony<br>- Assistance to attorney representing Petitioner | 500-02-051528-961 | Court of Quebec (Civil Division) | **For Petitioner**:<br>Francois Barette, Esq.<br>Goodman Philips & Vineberg, Attorneys<br><br>**For Defendants**:<br>Martine Bergeron, Esq.<br>Veillette & Associates |
| 2003 | Lenscrafters, Inc. vs. Centimark Corp.<br>- Deposition testimony only<br>- Assistance to attorneys representing Defendants | CA02-9412AF | Circuit Court of the 15th Judicial Circuit, Palm Beach County, FL | **For Petitioner**:<br>Jeffrey S. Lapin, Esq.<br>Larson King, LLP<br><br>**For Defendants**:<br>Gregory M. Palmer, Esq.<br>Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A. |

**Peter Gampel**
**Summary of Expert Witness Activities**
**Recent History Updated as of October 10, 2007**

Page 3

| Year | Case Name | Case Number | Jurisdiction | Attorneys |
|------|-----------|-------------|--------------|-----------|
| 2001 | Shoma Development Corporation<br>Vs.<br>Miller Legg; Glassman Co.,<br>-Deposition and trial testimony<br>-Assistance to attorneys representing Defendants | 98-11500 | Circuit Court of the 17th Judicial Circuit, Broward County | **For Petitioner:**<br>Oscar Sanchez, Esq.<br>Stacey Berum Boehm, Esq.<br>Akerman Senterfitt<br><br>**For Defendants**:<br>Clifford Gorman, Esq.<br>Kubicki Draper<br><br>Frank J. Sinagra<br>Harley, Sinagra & Perez |

## APPENDIX B

### DOCUMENTATION AND INFORMATION PROVIDED BY COUNSEL

Re:   ANIRE OKPAKU v. AMERICAN AIRLINES, INC.

PRELIMINARY EXPERT REPORT AND DISCLOSURE OF
PETER GAMPEL, CPA, ABV, ASA
SUBMITTED OCTOBER 10, 2007

In addition to my professional qualifications, my opinions are based on my understanding and my interpretation of the documentation, records and other information provided to me and reviewed as of the date of this report that included *inter alia*, the following:

- Raffa Preliminary Report dated September 24, 2007;
- Independent Contractor Agreement between Okpaku and Strax dated July 12, 2007;
- Complaint and other legal documentation;
- U.S. Individual Income Tax Returns of Okpaku for 2000 to 2006;
- Deposition transcripts of Anire Okpaku (March 9, 2007); Gaetano J. Scuderi, M.D. (July 16, 2007), and Jeffrey Davis (July 27, 2007);
- Business Plan for Blue Door Surgical & Medical Spa;
- Monthly calendar schedules for September-2006 through September-2007, which appear to be schedules of procedures performed by Okpaku at Strax;
- Strax Listing of Appointments (By Type) from July 18, 2006 through July 12, 2007, which appear to be appointments for procedures performed by Okpaku at Strax;
- Strax Transaction Detail by Account Report, which appear to be payments to Blue Door Medical (Okpaku) for the weeks ended 7/14/2006 through 8/25/2007; and
- List of procedures with hand-written prices for certain procedures.

I reserve the right to modify this report to the extent that a review of any additional documents assists me in forming my opinion.

**Schedule 1**

Summary Chart of Actual Number of Procedures by Anire Okpaku and
Estimated Number of Procedures per Strax Surgeon
(Excluding and Including Okpaku)
For the 14-month period from July 18, 2006 through September 21, 2007



**Schedule 2**

## Summary of Strax Payments to Okpaku
## For Weeks ended 7/14/2006 through 8/25/2007

|  | Payment date | For Week(s) Ended | # of weeks | Amount paid |
|---|---|---|---|---|
|  | 7/21/2006 | 7/14/2006 | 1 | $ 5,000 |
|  | 7/28/2006 | 7/22/2006 | 1 | 5,000 |
|  | 8/4/2006 | 7/29/2006 | 1 | 5,000 |
| Jul-06 |  |  | 3 | 15,000 |
|  |  |  |  |  |
|  | 8/12/2006 | 8/5/2006 | 1 | 7,174 |
|  | 8/21/2006 | 8/12/2006 | 1 | 5,000 |
|  | 8/25/2006 | 8/19/2006 | 1 | 5,334 |
|  | 9/1/2006 | 8/26/2006 | 1 | 6,735 |
| Aug-06 |  |  | 4 | 24,242 |
|  |  |  |  |  |
|  | 9/8/2006 | 9/2/2006 | 1 | 5,000 |
|  | 9/15/2006 | 9/9/2006 | 1 | 10,793 |
|  | 9/22/2006 | 9/16/2006 | 1 | 6,179 |
|  | 9/29/2006 | 9/23/2006 | 1 | 10,250 |
|  | 10/6/2006 | 9/30/2006 | 1 | 5,196 |
| Sep-06 |  |  | 5 | 37,419 |
|  |  |  |  |  |
|  | 10/13/2006 | 10/7/2006 | 1 | 7,804 |
|  | 10/20/2006 | 10/14/2006 | 1 | 9,075 |
|  | 10/26/2006 | 10/21/2006 | 1 | 7,332 |
|  | 11/3/2006 | 10/28/2006 | 1 | 5,000 |
| Oct-06 |  |  | 4 | 29,211 |
|  |  |  |  |  |
|  | 11/10/2006 | 11/4/2006 | 1 | 10,699 |
|  | 11/17/2006 | 11/11/2006 | 1 | 11,853 |
|  | 11/24/2006 | 11/18/2006 | 1 | 11,914 |
|  | 12/1/2006 | 11/25/2006 | 1 | 9,365 |
| Nov-06 |  |  | 4 | 43,831 |
|  |  |  |  |  |
|  | 12/8/2006 | 12/2/2006 | 1 | 10,960 |
|  | 12/15/2006 | 12/9/2006 | 1 | 11,487 |
|  | 12/22/2006 | 12/16/2006 | 1 | 5,256 |
|  | 1/5/2007 | 12/23/2006 | 1 | 10,853 |
|  | 1/12/2007 | 12/29/2006 | 1 | 5,000 |
| Dec-06 |  |  | 5 | 43,557 |
|  |  |  |  |  |
| Sub-total for 2006-period |  |  | 25 | $ 193,260 |

*(continued on next page)*

**Schedule 2**

Summary of Strax Payments to Okpaku
For Weeks ended 7/14/2006 through 8/25/2007

| | Payment date | For Week(s) Ended | | # of weeks | Amount paid |
|---|---|---|---|---|---|
| | 1/12/2007 | 1/6/2007 | | 1 | $ 5,268 |
| | 1/26/2007 | 1/19/2007 | (a) | 2 | 10,000 |
| | 2/9/2007 | 2/3/2007 | | 2 | 16,744 |
| Jan-07 | | | | 5 | 32,011 |
| | 2/23/2007 | 2/17/2008 | | 2 | 17,303 |
| | 3/9/2007 | 3/3/2007 | | 2 | 19,284 |
| Feb-07 | | | | 4 | 36,587 |
| | 4/2/2007 | 3/17/2007 | | 2 | 21,405 |
| | 4/7/2007 | 3/31/2007 | | 2 | 15,816 |
| Mar-07 | | | | 4 | 37,220 |
| | 4/20/2007 | 4/14/2007 | | 2 | 15,195 |
| | 5/4/2007 | 4/28/2007 | | 2 | 14,860 |
| Apr-07 | | | | 4 | 30,055 |
| | 5/18/2007 | 5/11/2007 | | 2 | 16,990 |
| | 6/1/2007 | 5/26/2007 | | 2 | 16,970 |
| May-07 | | | | 4 | 33,959 |
| | 6/15/2007 | 6/9/2007 | (b) | 2 | 20,960 |
| | 6/28/2007 | 6/23/2007 | | 2 | 18,896 |
| Jun-07 | | | | 4 | 39,856 |
| | 7/13/2007 | 7/7/2007 | | 2 | 19,193 |
| | 7/27/2007 | 7/21/2007 | | 2 | 15,648 |
| | 8/2/2007 | 7/28/2007 | | 1 | 12,058 |
| Jul-07 | | | | 5 | 46,898 |
| | 8/7/2007 | 8/4/2007 | | 1 | 11,732 |
| | 8/14/2007 | 8/11/2007 | | 1 | 6,756 |
| | 8/21/2007 | 8/18/2007 | | 1 | 8,528 |
| | 8/28/2007 | 8/25/2007 | | 1 | 4,570 |
| Aug-07 | | | | 4 | 31,586 |
| Subtotal for 2007 period | | | | 34 | 288,172 |
| Total for weeks ended 7/14/2006 through 8/25/2007 | | | | 59 | $ 481,432 |

(a) Description indicated 1/8/07, however, week 1/19 was skipped, therefore it seems payment was for 2 weeks
(b) Description indicated 5/14 - 26/2007, however this period is the same as 6/1 payment; therefore, correct period seems to be 6/9/2007.

*Source: Strax Transaction Detail by Account, Payments to Blue Door Medical (Okpaku)*
*for the weeks ended 7/14/2006 through 8/25/2007.*